13 F.3d 559
 1994 Copr.L.Dec. P 27,198, 29 U.S.P.Q.2d 1356
 IN DESIGN, also known as Hukafit Sportswear, Inc.,
Plaintiff-Appellee-Cross-Appellant,
v.
K-MART APPAREL CORP.,
Defendant-Third-Party-Plaintiff-Appellant-Cross-Appellee,
Selective Knitwear, Incorporated, Third-Party-Defendant-Appellant.
 Nos. 703, 841, Dockets 92-7779, 92-7841.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 11, 1993.
Decided Jan. 5, 1994.
 
 Stuart E. Abrams, New York City (Sandor Frankel, Bender & Frankel, New York City, of counsel), for K-Mart Apparel Corp.
 George Gottlieb, New York City (John R. Mugno, Gottlieb, Rackman & Reisman, New York City, of counsel), for In Design.
 Before: VAN GRAAFEILAND, CARDAMONE and JACOBS, Circuit Judges.
 CARDAMONE, Circuit Judge:
 This appeal involves concepts of copyright law and retail business practices. K-Mart Apparel Corp. (K-Mart), the well-known discount retailer, was held liable for copyright infringement because it sold certain sweaters bearing the copyrighted "Damask" design. A trial was then held on the amount of damages it owed to In Design, also called Hukafit Sportswear, Inc. (Hukafit), the copyright holder. The trial resulted in an amended judgment for over $630,000 against K-Mart. It is from this judgment that K-Mart appeals and Hukafit cross-appeals.
 One of the principal questions before us is what an infringer may properly claim as deductible expenses from gross revenues derived from the sale of an infringing item. K-Mart regularly employs a policy of markdowns as part of the logistics of moving manufactured goods to its customers in a timely and cost-efficient manner, to keep inventories low, to make room on its shelves, and to prevent the supply pipeline from becoming plugged. It tried unsuccessfully to demonstrate how this policy reduced its revenues on some of the 52,800 copyrighted sweaters sold at an initial retail selling price of $19.97. This practice of retail discounting, which is well-known to shoppers, was not included in the district court's computation of damages. For this and several other reasons explained below, the case must be remanded.
 
 BACKGROUND
 
 1
 Hukafit commenced this copyright infringement action against K-Mart on November 25, 1987 in the United States District Court for the Southern District of New York before Judge Kenneth Conboy, claiming that the retailer was selling a sweater bearing a design copyrighted by Jeffrey Rogers Knitwear Productions, Ltd. (Rogers Knitwear), and exclusively licensed by it to Hukafit in 1984. Hukafit had sold sweaters bearing the Damask design until 1986. In September 1987 K-Mart purchased from a wholesale supplier named Selective Knitwear, Inc. (Selective) 52,800 garments with the same design. K-Mart then sold the sweaters nationwide for at least 11 weeks from November 7, 1987 through January 23, 1988 in its 2,200 stores.
 
 
 2
 Hukafit had first notified K-Mart of the claimed infringement on November 3, 1987. Upon learning of this claim, K-Mart and its counsel investigated the matter and concluded that K-Mart was not infringing. It continued therefore to sell the Damask design sweaters. Several weeks later the instant litigation began. K-Mart then sued its supplier, Selective, in a third-party indemnity action because Selective had agreed to indemnify K-Mart for all costs and damages it might incur as a result of the Hukafit suit.
 
 
 3
 The parties agreed to a bifurcated bench trial on the issues of liability and damages. In an opinion and order dated May 14, 1991 Judge Conboy found K-Mart liable for copyright infringement in violation of 17 U.S.C. Sec. 501 (1988 & Supp. II 1990). He further found that Hukafit was a valid licensee of the Rogers Knitwear copyright, and rejected Selective's three affirmative defenses purporting to explain the origin of the design on its similar sweaters. Although the district court found K-Mart liable for copyright infringement, it expressly reserved decision on whether the infringement was willful until the damages phase of the proceedings.
 
 
 4
 A bench trial on damages held in September, 1991 resulted in a March 10, 1992 order directing K-Mart to pay Hukafit $560,245.59 in damages. This sum represented K-Mart's profits before taxes on the Damask sweaters. K-Mart's November 1987 investigation of the Hukafit claim was reviewed by the trial court, which found the legal advice given to K-Mart, based on the facts then known, was carefully prepared and that K-Mart was justified in relying upon it. The district court also ruled that two previously settled infringement actions by Hukafit against K-Mart were irrelevant to the issue of willful infringement. The district judge then ruled K-Mart not to be a willful infringer and declined to award Hukafit attorneys' fees or prejudgment interest. Judgment on these findings was entered on March 26, 1992.
 
 
 5
 Hukafit and Selective each moved for reconsideration of the damage award. On June 9, 1992 the district court reaffirmed its findings concerning the profits K-Mart earned from the sale of the sweaters, but corrected a mathematical error it had made that had overstated the damages owed by K-Mart in the amount of $77,473.05. The error resulted when the court applied an overhead deduction figure of 26.89 percent to K-Mart's gross profits ($766,305) instead of to K-Mart's gross sales ($1,054,416). The trial court then awarded Hukafit attorneys' fees and costs in the amount of $150,000 based upon its revised finding that "K-Mart and Selective have protracted this action by several years through the interposition of bogus defenses, a direct consequence of which conduct has been large and necessary legal bills infl[ic]ted upon Hukafit."
 
 
 6
 An amended judgment entered on June 24, 1992 awarded Hukafit total damages of $632,772.54 against K-Mart. From this judgment K-Mart appeals, no longer disputing liability for infringement, but instead contending that the district court erroneously calculated its profits because it failed to use the actual wholesale price or the proper retail price of the sweaters after sales and markdowns, and because it failed to take into account K-Mart's tax expense as an item that reduced its profits. K-Mart also contests the $150,000 award of attorneys' fees to Hukafit, in light of the fact that the district court had not altered its original finding that K-Mart was not a willful infringer. Hukafit cross-appeals challenging the amount of the damage award, which it believes was based on an inflated overhead figure proffered by K-Mart, and because the judgment does not award it prejudgment interest.
 
 DISCUSSION
 I Determination of K-Mart's Profits
 
 7
 Section 504(b) of the Copyright Act provides that a "copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement." 17 U.S.C. Sec. 504(b) (1988). Because Hukafit stopped selling its Damask sweaters a year before K-Mart began selling them in 1987, the copyright holder did not seek actual damages, typically the reduced market value of the copyrighted work, see 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, Sec. 14.02[A] (1993), but sought instead to recover K-Mart's profits attributable to the infringing sale of Damask sweaters.
 
 
 8
 Under Sec. 504(b) the copyright holder initially must present proof of the infringer's gross revenue. See 17 U.S.C. Sec. 504(b). The burden of going forward then shifts to the infringer "to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." Id. Computations of gross revenues, expenses and profits present questions of fact, see Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 409, 60 S.Ct. 681, 688, 84 L.Ed. 825 (1940), to be decided by the trial court, subject on appeal to the clearly erroneous standard of review, see Business Trends Analysts, Inc. v. Freedonia Group, Inc., 887 F.2d 399, 404 (2d Cir.1989). Since the term "profit" is not defined in the Copyright Act, the word has been assigned its usual meaning, such as the excess of return over expenditures realized from the conduct of a business or the gain derived from an investment represented by the difference between its selling price above its cost. See MCA, Inc. v. Wilson, 677 F.2d 180, 186 (2d Cir.1981). We address in turn K-Mart's and Hukafit's challenges to the trial court's profit calculation.
 
 A. Sweater Retail Price
 
 9
 Hukafit presented evidence that the 52,800 sweaters were offered for sale at an initial retail price of $19.97 per sweater. The trial court multiplied these two numbers to find that K-Mart's gross revenue on the sale of the sweaters was $1,054,416. K-Mart offered evidence that due to sale prices and markdowns many of the sweaters sold at prices substantially lower than $19.97 each. According to the retailer, its gross revenue from the Damask sweaters only amounted to $901,915. The trial court refused to consider this evidence. K-Mart contends that the district court erroneously placed the burden of proving gross revenue as required by Sec. 504(b) on K-Mart, and insists that its evidence of reduced sweater prices was the only proof offered on the issue of gross revenue, so it must be credited. K-Mart also asserts that it was error for the trial court to refuse to consider its evidence of markdowns.
 
 
 10
 We address these arguments in turn. Hukafit presented a prima facie case when it established the number of sweaters sold and their initial retail price. The copyright holder cannot realistically be required to offer more proof than this since the facts and figures of the sales and markdowns is a subject exclusively within the infringer's knowledge. Once a prima facie case of gross revenue was established, the burden shifted to K-Mart to prove its deductible expenses. See 17 U.S.C. Sec. 504(b). In discharging that burden it is not necessary for K-Mart's proof to be precise and perfect because, absent bad faith, reasonable approximations constitute satisfactory evidence. See Nimmer & Nimmer, supra, Sec. 14.03[B], at 14-35 to -36. Any doubts resulting from an infringer's failure to present adequate proof of its costs are resolved in favor of the copyright holder. See Gaste v. Kaiserman, 863 F.2d 1061, 1070-71 (2d Cir.1988).
 
 
 11
 As a discount retailer, a large portion of K-Mart's business involves the sale of merchandise at less than its initial offering price. K-Mart attempted to prove the extent of its discounting with regard to the Damask sweaters by introducing three "flash reports." These reports are internal business documents that showed the number of Damask sweaters in inventory. The retailer also introduced evidence of two nationwide off-price sales on sweaters in its stores, and disclosed statements that purported to reflect its automatic policy of permanent markdowns on Damask sweater prices after December 16, 1987.
 
 
 12
 The trial court was unimpressed with the "flash" reports and refused to consider them. It found these weekly reports unpersuasive because K-Mart produced only three of them, though the Damask sweaters sold for 11 weeks. It criticized, in addition, the fact that only one page from each flash report--the page concerning the Damask style sweater, instead of the entire report--was produced. The trial court dismissed K-Mart's records showing automatic price markdowns because the flash reports were not complete enough for it to calculate how many sweaters were sold during the markdown period. It also rejected K-Mart's evidence of national off-price sweater sales because the advertisements did not show that the Damask sweaters were sold in the regions where the advertising appeared.
 
 
 13
 It was clear error for the district court to reject summarily the entire body of evidence indicating that K-Mart discounted the sweaters. While it is true the retailer's evidence was not ideal, some allocation should have been made for the obvious reductions from the original retail price. See Sygma Photo News, Inc. v. High Soc'y Magazine, Inc., 778 F.2d 89, 93 (2d Cir.1985). For example, each of the three flash reports reflected inventory levels for a three-week period. The report pages offered were those dealing only with the Damask sweaters. Hence, K-Mart's inventory levels for nine of the 11-week sales period for Damask sweaters are documented. The two-week gap should simply have been resolved in the copyright holder's favor, rather than refusing to give credence to any of the information contained in the infringer's reports.
 
 
 14
 Had the district court examined this proof with respect to K-Mart's inventory level for the subject sweaters, it could then have considered K-Mart's business records showing progressive merchandise markdowns and by that means have more closely estimated the sweaters' sales prices. Hukafit criticizes K-Mart's markdown evidence--a progressive markdown chart--because it is dated March 19, 1984. But K-Mart controller Eugene Philips testified that the 1984 chart was still in effect in 1987, the district court made no credibility finding adverse to Philips' testimony, and K-Mart produced documentary evidence of sweater price reductions dated December 1987. By the same token, although K-Mart's advertising proof, announcing nationwide sweater sales, does not compel the conclusion that the sale prices applied in every U.S. market, such evidence, if credited, justifies some estimated allowance for discount pricing.
 
 
 15
 In sum, by failing to credit appropriate deductions from the original selling price of the Damask sweaters, the computation of gross revenues was overstated. This led, in turn, to an incorrect figure for net profits. Giving the copyright holder the benefit of the doubt does not mean that the infringer's evidence should be entirely ignored. Recognizing that actual calculation of profits is a matter ordinarily best performed by the trial court, Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd., 885 F.2d 1, 7 (2d Cir.1989), cert. denied, 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990), we remand this aspect of the case for a recalculation of K-Mart's net profits, one which takes into consideration such evidence as is credited by the district court that many of the sweaters retailed for far less than $19.97.
 
 B. Cost of Goods Sold
 
 16
 K-Mart also sought to prove that the amount it paid Selective to purchase the sweaters should be deducted from gross revenue. See Sygma, 778 F.2d at 93 (allowing infringer to deduct production expenses). It presented invoices from Selective and its own cancelled checks indicating a total purchase price of $475,200 for the 52,800 sweaters. The district court found K-Mart actually paid only $288,111 for the merchandise. It arrived at this reduced figure by subtracting $4,752 for a warehouse discount, $6,897 for an anticipation credit and $175,440 for a "hold" placed by K-Mart on the amount it owed Selective. The two small reductions are not disputed. But K-Mart challenges the subtraction of $175,440 to reflect the "hold."
 
 
 17
 The proof with respect to the hold consisted of a handwritten memorandum from Gemma D'Andrea, manager of K-Mart's tax department, to K-Mart's counsel. It appears that Selective and K-Mart had done business together on a regular basis; hence, they maintained a running account. The memo reflects the "hold history" on K-Mart's account with Selective, which, according to D'Andrea's testimony, "is how much of the accounts payable account of the Selective account was not paid, was held or released, whatever is indicated after each date." In its entirety, the memo states,
 
 
 18
 The hold history on Selective's account is:
 
 11/05/87 $100,000
 12/09/87 released hold
 01/29/88 $250,000
 06/02/88 $250,000 maintained
 10/14/88 reduced to $100,000
 
 19
 11/10/89 increased to entire acct balance to date--$175,440
 
 
 20
 The district court found the $175,440 hold "did in fact relate to the [D]amask sweaters sale" and that K-Mart never paid Selective $175,440 of the purchase price. K-Mart declares the holds it placed on Selective's account were unrelated to the cost of the sweaters. Instead, it says the holds merely collateralized the indemnity relationship between K-Mart and Selective, which was formalized in a November 11, 1987 indemnity agreement.
 
 
 21
 The trial court incorrectly reduced K-Mart's cost of goods sold by $175,440. Upon reading the memo, it appears no hold existed on the Selective account on December 9, 1987. K-Mart issued checks to pay the Damask sweater invoices on December 10, 1987. Despite Hukafit's contrary assertion, by permitting K-Mart to deduct from its gross revenues what the sweaters cost--reflected by Selective's invoices and K-Mart's cancelled checks--we do not engage in speculation as to whether K-Mart will ever pay Selective the now existing $175,440 hold. The indemnity relationship between Selective and K-Mart, and the means by which they choose to secure it, is irrelevant to the net profits calculation in this case.
 
 
 22
 Hence, the district court's subtraction of $175,440 from K-Mart's deductible expenses as part of its cost of goods sold was clearly erroneous. The purchase price of $475,200 should only be reduced by the warehouse discount and anticipation credit totalling $11,649, leaving K-Mart's cost of goods sold at $463,551.
 
 C. Overhead Charge
 
 23
 Overhead expense is also a proper deduction from the profits of an infringer, who has the "burden of proving that each item of general expense contributed to the production of the infringing items, and of further offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue." Nimmer & Nimmer, supra, Sec. 14.03[B], at 14-34. K-Mart offered--and the district court accepted as reasonable--an overhead formula of 26.89 percent of gross sales.
 
 
 24
 On its cross-appeal, Hukafit contends the overhead charge is without a basis in the record because K-Mart failed to show how a portion of the 26.89 percent--a 13.87 percent "net rent" component--related to the rent paid on the actual store space used to display and sell the Damask sweaters. This argument confuses the concepts of renting store space with overhead expense. "Net rent" paid by K-Mart to its parent includes selling and administrative costs in addition to the cost of renting space. According to the testimony of K-Mart controller Philips, the overhead charge of 26.89 percent of sales covers expenses such as rent, advertising, payroll, shipping and store supplies.
 
 
 25
 We cannot say it was clearly erroneous for the district court to accept K-Mart's overhead formula. K-Mart met its burden of offering a reasonable formula, and the absolute certainty Hukafit requests is not required. See Sheldon v. Metro-Goldwyn Pictures Corp., 106 F.2d 45, 52-53 (2d Cir.1939) (L. Hand, J.) (overhead calculated as a proportion of the cost of movie production), aff'd, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940); see also Love v. Kwitny, 772 F.Supp. 1367, 1371 (S.D.N.Y.1991) (overhead calculated as proportion of net sales), aff'd, 963 F.2d 1521 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 181, 121 L.Ed.2d 127 (1992); Dolori Fabrics, Inc. v. Limited, Inc., 662 F.Supp. 1347, 1356 (S.D.N.Y.1987) (Lumbard, J.) (overhead calculated as a percentage of total sales revenues). The deduction for K-Mart's overhead expense therefore was proper.
 
 D. Tax Expense
 
 26
 In its March 10, 1992 damages opinion the district judge refused to deduct taxes K-Mart paid on income from sales of the Damask sweaters, which the retailer estimated as 42.94 percent of its income. K-Mart avers this refusal was error because as a nonwillful infringer, K-Mart may reduce gross profits through a legitimate deduction for income taxes and thereby pay an after-tax damage award to Hukafit.
 
 
 27
 It is settled law that the income tax paid on profits is not deductible where infringement was conscious and deliberate. See L.P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co., 277 U.S. 97, 48 S.Ct. 449, 72 L.Ed. 800 (1928); Alfred Bell & Co. v. Catalda Fine Arts, Inc., 191 F.2d 99, 106 (2d Cir.1951); Sheldon v. Metro-Goldwyn Pictures Corp., 106 F.2d at 53. In Larson, a case of a willful infringer, the Supreme Court held that the defendant could not deduct federal income and excess profits taxes from its gross income in determining the net profit for which it was liable. 277 U.S. 97, 99-100, 48 S.Ct. 449. But the Court carefully limited the breadth of its holding recognizing that there could be cases where the circumstances of the infringer's conduct dictated that such a tax deduction would be proper. See id.
 
 
 28
 In Stromberg Motor Devices Co. v. Detroit Trust Co., 44 F.2d 958, 965 (7th Cir.1930), a patent infringement case, the Seventh Circuit interpreted Larson 's caveat to stand for the proposition that in the case of a nonwillful infringer, such an income tax deduction would be appropriate. In Stromberg Motor Devices Co. v. Zenith-Detroit Corp., 73 F.2d 62, 65 (2d Cir.1934), cert. dismissed, 294 U.S. 735, 55 S.Ct. 509, 79 L.Ed. 1263 (1935), citing both Larson and Stromberg Motor Devices Co. v. Detroit Trust Co., we ruled that in the case of a nonwillful patent infringer an income tax deduction would be appropriate.
 
 
 29
 In Alfred Bell & Co. v. Catalda Fine Arts, Inc., we were called upon to decide the same issue already decided in the patent infringement context in a copyright case. The district court interpreted Larson as we had in Stromberg Motor Devices, and found Catalda was not a willful infringer, and that it thus was entitled to an income tax deduction. See 86 F.Supp. 399, 418-19 (S.D.N.Y.1949). On appeal, we agreed with the district court's view of the law but rejected its finding of innocent infringement, noting that "[o]pen and unabashed piracy is not a mark of good faith" and that "in [those] circumstances " it was not proper to deduct taxes. See Alfred Bell, 191 F.2d at 106 (emphasis supplied).
 
 
 30
 A similar result was reached in another copyright case, where the district court allowed a credit for income taxes paid. See Sheldon v. Metro-Goldwyn Pictures Corp., 26 F.Supp. 134, 142 (S.D.N.Y.1938). Again, on appeal we recognized the Stromberg Motor Devices case as authoritative precedent, but reversed the district court because it erred in finding the defendants were not deliberate plagiarists. See Sheldon, 106 F.2d at 53.
 
 
 31
 The district court's reliance on Love v. Kwitny is misplaced. It was an appeal from the district court that was affirmed without opinion and therefore not binding precedent. See 2d Cir. R. 0.23. In disallowing deductions for taxes regardless of innocence, Love relied on Schnadig Corp. v. Gaines Mfg. Co., 620 F.2d 1166, 1169-71 (6th Cir.1980), and declined to follow Stromberg Motor Devices, Alfred Bell and Sheldon, which are controlling precedents, wrongly dismissing their statements as dicta because of the ultimate results those cases reached. See Love, 772 F.Supp. at 1371. Schnadig purports to illustrate hypothetically how an infringer in a patent infringement case who pays damages based on after-tax profits and takes an income tax deduction as allowed under the Internal Revenue Code, 26 U.S.C. Sec. 162 (1988 & Supp. III 1991), in the amount it paid to a patentee would, in the example the court uses, yield a net gain, leaving it in about the same position as the patent holder. See 620 F.2d at 1169.
 
 
 32
 We think that when a claim is made for infringing profits, "[t]his means profits actually made. A book profit of a dollar is not a profit actually made when from the dollar the government takes twenty cents as the price for the right to make any profit at all." Macbeth-Evans Glass Co. v. L.E. Smith Glass Co., 23 F.2d 459, 463 (3d Cir.1927). Hypothetical discussions of possible indirect tax ramifications do not change this basic fact. In appropriate cases therefore we include income tax expenses in the deductible overhead in determining a defendant's net profit. See, e.g., Murphy Door Bed Co. v. Interior Sleep Sys. Inc., 874 F.2d 95, 103 (2d Cir.1989). Because the district court found K-Mart to be a nonwillful infringer, it should have allowed K-Mart a deduction for the taxes it paid on its innocently-acquired unlawful profits.
 
 II Attorneys' Fees
 
 33
 Upon reconsidering the damages issue, the district court in a second opinion reversed its earlier refusal to award Hukafit attorneys' fees. It agreed with Hukafit that attorneys' fees are normally granted to prevailing copyright plaintiffs "as a matter of course," and that the indemnity relationship between K-Mart and third-party defendant Selective made K-Mart responsible for "the introduction of bogus defenses that protracted the case to the severe detriment of Hukafit." It then awarded Hukafit a "modest" fee of $150,000.
 
 
 34
 The Copyright Act states that in its discretion a court may "award a reasonable attorney's fee to the prevailing party." 17 U.S.C. Sec. 505 (1988). A distinction is drawn between prevailing plaintiffs and defendants in copyright actions. We agree that attorneys' fees are awarded to prevailing plaintiffs as a matter of course. See, e.g., Folio Impressions, Inc. v. Byer Cal., 937 F.2d 759, 767 (2d Cir.1991); Whimsicality, Inc. v. Rubie's Costume Co., 891 F.2d 452, 457 (2d Cir.1989). But prevailing defendants are awarded attorneys' fees only where the plaintiff's suit was brought in bad faith or was a baseless or frivolous action. See, e.g., Roth v. Pritikin, 787 F.2d 54, 57 (2d Cir.1986). The different treatment of successful plaintiffs from defendants is based on the purpose of the Copyright Act, which is designed to encourage plaintiffs to act to protect their copyrights. See, e.g., Diamond v. Am-Law Publishing Corp., 745 F.2d 142, 148 (2d Cir.1984). Awards of attorneys' fees to defendants are granted more sparingly to serve the same purpose, that is, that plaintiffs not be chilled in exercising their rights under the Copyright Act. See, e.g., Roth, 787 F.2d at 57.
 
 
 35
 We reverse an award of attorneys' fees only if we believe the district court has abused its discretion. Twin Peaks Prods., Inc. v. Publications Int'l, Ltd., 996 F.2d 1366, 1383 (2d Cir.1993). K-Mart argues that the district court's reversing itself on the attorneys' fees issue without changing its original finding that K-Mart was not a willful infringer is an abuse of its discretion. The cornerstone of this argument rests on the proposition that attorneys' fees may not be awarded against a defendant who is an innocent infringer.
 
 
 36
 An award of attorneys' fees has the consequential effect of penalizing the losing party. An award's primary purpose is, as already stated, to serve as an economic incentive for a copyright holder to use the courts in challenging an infringement. See, e.g., Oboler v. Goldin, 714 F.2d 211, 213 (2d Cir.1983) (per curiam). The fact that a defendant has been held liable for infringement necessarily means the defendant is blameworthy. See Nimmer & Nimmer, supra, Sec. 14.10[D], at 14-126. Willful infringement therefore is not a necessary requirement for an award of attorneys' fees to a prevailing plaintiff. An award to prevailing plaintiffs nonetheless remains discretionary with the trial court.
 
 
 37
 K-Mart correctly points out that the district court never altered its original finding that it was not a willful infringer because it relied in good faith on the advice of counsel that no infringement had taken place. The trial court made this finding in its March 10, 1992 opinion after a detailed look at K-Mart's response to Hukafit's infringement notice. As related, K-Mart immediately hired expert copyright counsel who contacted Hukafit's attorney and investigated the infringement claim. This investigation revealed that Selective, the sweater supplier, possessed a receipt for a sweater it purchased in Israel that was used as a pattern for the K-Mart sweaters. Thus, in counsel's view, any copying of Hukafit's copyrighted design was disproved. K-Mart shared this information with Hukafit's counsel at a November 1991 meeting. After learning of it, Hukafit's counsel declined to move in district court for a preliminary injunction to halt the sale of the K-Mart sweaters, in part because counsel did not believe that he could show the required element of likelihood of success on the merits.
 
 
 38
 On reconsideration, the district court vacated its earlier analysis on the revised finding that K-Mart should be held accountable for the litigation tactics of Selective, the third-party defendant. Characterizing Selective as "K-Mart's partner and collaborator in the injury to Hukafit's rights," the district court agreed with Hukafit that "bogus defenses were raised by Selective on behalf of and for the benefit of K-Mart, its indemnitee, that it was K-Mart that brought Selective into the case, and that K-Mart in effect turned the conduct of the litigation over to Selective." But the existence of this indemnity relationship was not new information. The district court was fully aware of this fact at the time it made the initial attorneys' fees determination. Moreover, the revised finding is a radical departure from the trial court's earlier conclusion that "the unfortunate duration and cost of this lawsuit, and the concomitant litigation burdens imposed, were principally the result of the trial strategy of Hukafit and Selective.... To require K-Mart to pay Hukafit's legal bills under such circumstances would be manifestly unfair." (emphasis supplied).
 
 
 39
 Consequently, it was an abuse of discretion for the district court to change, without a reasoned explanation, its characterization of K-Mart's conduct in the litigation. Cf. Roth, 787 F.2d at 57-58 (holding that the district court abused its discretion when it employed "post hoc reasoning" to revise an earlier determination that plaintiff's losing claim was not baseless, frivolous, unreasonable, or brought in bad faith and to award defendant attorneys' fees). Further, because K-Mart's profits from infringement must be recalculated, an award of attorneys' fees, if any, must also be reconsidered. See N.A.S. Import, Corp. v. Chenson Enters., Inc., 968 F.2d 250, 254 (2d Cir.1992); Oboler, 714 F.2d at 213.
 
 
 40
 As a result, we need not reach or determine K-Mart's alternative argument that an award of attorneys' fees here is inappropriate because Hukafit hired its counsel on a 50 percent contingency fee basis. We remind the trial court on remand that it retains the authority to ensure that a contingent fee arrangement does not result in an unjustified windfall to plaintiff's counsel. Cf. Wheatley v. Ford, 679 F.2d 1037, 1041 (2d Cir.1982) (Court has power to formulate fee award designed to avoid providing a windfall to a successful attorney in a case under 42 U.S.C. Sec. 1988). The $150,000 award of attorneys' fees to Hukafit must therefore be remanded for the district court to give this issue closer scrutiny upon reconsideration.
 
 III Prejudgment Interest
 
 41
 In its March 10 damages opinion the district court declined to award Hukafit prejudgment interest. Whether an award of prejudgment interest is or is not permissible under the current Copyright Act, which neither expressly allows nor prohibits such award, remains unresolved in this Circuit. See Love, 772 F.Supp. at 1373. In a case under the 1909 Copyright Act, we affirmed--without discussion--an award of prejudgment interest. See Lottie Joplin Thomas Trust v. Crown Publishers, Inc., 592 F.2d 651, 656 (2d Cir.1978). Another circuit, upon review of the specific damage award and the statutory purpose to deter infringement, declined to award prejudgment interest to a copyright holder. See Robert R. Jones Assocs. v. Nino Homes, 858 F.2d 274, 282 (6th Cir.1988).
 
 
 42
 On its cross-appeal Hukafit asserts that the district court erred by not analyzing the factors set forth in Wickham Contracting Co. v. Local Union No. 3, IBEW, 955 F.2d 831, 836 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992), which held that prejudgment interest could be awarded under the Labor Management Relations Act, 1947, 29 U.S.C. Sec. 187 (1988). That statute was also silent on this subject. In Wickham we said that prejudgment interest can be awarded where the court's inquiry includes "analysis of the pertinent statute and its purposes; the need to fully compensate the injured party; fairness and the relative equities; and the specific circumstances of the parties and of the case." 955 F.2d at 836. Although Hukafit declares that the Wickham factors must be weighed in every case, such view misconstrues our holding.
 
 
 43
 Hukafit ignores Wickham 's statement that an award of prejudgment interest is equitable and discretionary. 955 F.2d at 835-36. That case guides analysis when prejudgment interest is to be awarded, but does not dictate when a particular case warrants such an award. We need not address the question of whether prejudgment interest is appropriate in copyright infringement cases generally, because here the district court did not abuse its discretion in declining to make an award. The district court's discretion is fully supported in light of Hukafit's sizable damage award and the lack of any initiative on Hukafit's part to shorten this litigation.
 
 CONCLUSION
 
 44
 Accordingly, the judgment of the district court is reversed and the case remanded for a recalculation of K-Mart's profits from infringement, consistent with this opinion. The judgment is also reversed and remanded for reconsideration insofar as it awarded attorneys' fees to the copyright holder. The judgment appealed from is otherwise affirmed. Cross-appeal affirmed.