John ALEXANDER d/b/a Alexander & Company and Schiffer Publishing, Ltd., Plaintiffs and Counter–Defendants,

v.

CHESAPEAKE, POTOMAC, AND TIDEWATER BOOKS, INC. d/b/a The Washington Book Trading Company and G. Paul Modrak, Defendants and Counter–Plaintiffs.

Civ. A. No. 98–1595–A.

United States District Court, E.D. Virginia, Alexandria Division.

Aug. 26, 1999.

Russell J. Gaspar, Cohen, Mohr, LLP, Washington, DC, for plaintiffs.

Scott A. Zebrak, Venable, Baetjer, Howard & Civiletti, LLP, Washington, DC, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This action arises out of a dispute over the rights to publish John Alexander's books of Washington, D.C., ghost stories. Plaintiffs Alexander and Schiffer Publishing, his current publisher, brought claims of copyright infringement, breach of contract, interference with contractual relations, and unjust enrichment against Alexander's former publisher, Chesapeake, Potomac, and Tidewater Books, Inc. (doing business as the Washington Book Trading Company), and its president and owner, Paul Modrak. Defendants counterclaimed, alleging breach of contract, tortious interference with contract and contractual expectancy, and copyright infringement. The matter was tried to a jury, which found defendants liable for breach of contract and tortious interfer-

ence with contractual relations.[1] In the course of the trial, the parties agreed to allow the Court to decide plaintiff Alexander's copyright damages in the event of a jury verdict in favor of plaintiffs on the contract claim. From the jury's verdict on Alexander's breach of contract claim, it follows, necessarily, that defendants infringed Alexander's copyright when they continued to sell his book after the termination. Accordingly the matter is now before the Court for determination of the amount of damages due Alexander under the Copyright Act.

## I.[2]

John Alexander is the author of *Ghosts: Washington's Most Famous Ghost Stories* ("*Ghosts*") and of *Ghosts: Washington Revisited* ("*Ghosts Revisited*"). On April 19, 1975, Alexander entered into an agreement with Washingtonian Books to publish *Ghosts*. This agreement called for the publisher to pay royalties to Alexander every six months—specifically, in April and October of each year. Alexander copyrighted *Ghosts* on December 23, 1975, and it was published soon after. In 1979, Paul Modrak, individually and doing business as Washington Book Trading Company ("Modrak"), succeeded to all the obligations, responsibilities, and benefits held by Washingtonian Books pursuant to its contract with Alexander. Nothing material to the dispute at bar occurred during the period 1979 to 1982, when *Ghosts* went out of print.

In 1989, Modrak republished *Ghosts*. In the years that followed, relations between author and publisher grew increasingly strained as Modrak's semiannual royalty payments became increasingly untimely. Specifically, from 1991 onward, Modrak paid Alexander his royalties at a later date than that required by the publishing contract. For instance, the royalties due in 1991 (for sales made in 1990 and 1991)

were not paid in full until two and a half months after they came due under the contract. The payment delays grew longer in the years that followed. By 1995, the royalties due that year arrived fifteen and a half months late. Thereafter, on April 16, 1997, Alexander wrote to Modrak stating that he was terminating the contract because Modrak had materially breached the contract by failing to make timely royalty payments.

After Alexander's letter of termination, defendants continued to publish, distribute, and sell *Ghosts*. Alexander continued to accept royalty payments from Modrak after April 1997, but only those which reflected sales made through June 1997. Defendants withheld royalties due Alexander for sales made after June 30, 1997.

In August 1997, Alexander, in his search for a publisher for *Ghosts Revisited,* an updated and expanded version of *Ghosts,* contacted Schiffer Publishing and shortly thereafter entered into a contract with Schiffer to publish this book. One year later, in August 1998, Schiffer began marketing *Ghosts Revisited.* It was then that Schiffer discovered that defendants' *Ghosts* was still on the shelves of potential customers. Attorneys for both defendants and Alexander promptly informed the booksellers that they were risking copyright infringement liability if they sold the competitor's book. This exchange of letters largely destroyed the market for both books.

At trial, the jury found defendants liable for breach of contract and tortious interference and awarded $16,175.50 in damages to Alexander for his breach of contract claim and $57,750 damages to Alexander and Schiffer Publishing, jointly, for their tortious interference claim. The parties agreed to commit Alexander's copyright infringement claim to the judgment of the Court. Since a finding that

---

1. The unjust enrichment claim was not pursued at trial, and the jury was not instructed on this claim.

2. In this and the other sections of this memorandum opinion, the Court, pursuant to Rule 52, Fed.R.Civ.P., sets forth its findings of fact necessary to a resolution of the copyright damages issue.

defendant infringed Alexander's copyright follows necessarily from the jury's verdict, only the copyright damages question remains before entry of final judgment.

## II.

Under the Copyright Act, a plaintiff may elect to receive statutory or actual damages. *See* 17 U.S.C. § 504. Alexander did not elect statutory damages before the case was submitted to the jury. Therefore, only actual damages are available to Alexander, which he now requests in the form of an award of Modrak's profits from the infringement, pursuant to 17 U.S.C. § 504(a) and (b). This section of the Copyright Act provides that a copyright owner "is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." The section further provides that "[i]n establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of [the infringer's] profit attributable to factors other than the copyrighted work." *Id.*

Thus, in the instant case, Alexander seeks copyright damages in the amount of Modrak's profits from sales of infringing copies of *Ghosts*. For their part, defendants argue that Alexander is entitled to no copyright damages, as he has been made completely whole by the jury's award of damages on the breach of contract and tortious interference claims and thus would receive a double recovery if any damages are awarded under the Copyright Act. This is so, defendants continue, because Alexander has suffered only a single injury, namely, the harm flowing from Modrak's continued printing and sale of *Ghosts* after Alexander terminated the publishing contract. Defendant's conclude the jury's verdict has already made him whole in this regard. For the reasons that follow, defendants' argument succeeds in small part and fails in the larger part.

The text of the Copyright Act makes clear that a plaintiff may only receive an infringer's profits when those profits are not taken into account in the computation of actual damages.[3] In the case of "competitive" sales, or sales in which the copyright holder and the infringer are selling to the same market, awards of infringer's profits tend to duplicate awards for actual damages. *See Deltak v. Advanced Sys.*, 767 F.2d 357, 363 (7th Cir.1985); *U.S. Payphone v. Executives Unlimited*, 781 F.Supp. 412, 414 (M.D.N.C.1991). Thus, if Alexander were unable to sell *Ghosts Revisited* because customers purchased Modrak's infringing *Ghosts* instead, Alexander's actual damages would be lost royalties. If he recovered these damages from Modrak, any further award in the amount of Modrak's profits from his sales to customers who would otherwise have bought the book published by Schiffer would represent a double recovery for the same injury, unless Modrak's profits were greater than Alexander's actual damages, *i.e.*, the lost royalties. In that event, only those profits exceeding Alexander's actual damages would be recoverable under the Copyright Act.[4]

---

3. Thus, "[i]f the profits the owner would have made but for the infringement are equal to the profits the infringer made by selling the copyrighted item, ... the 'not taken into account' clause [of § 504(b)] ... bars the owner from receiving an additional award of damages based on the infringer's profits." *Taylor v. Meirick*, 712 F.2d 1112, 1120 (7th Cir.1983), quoted in *U.S. Payphone v. Executives Unlimited*, 931 F.2d 888, 1991 WL 64957, at *4 (4th Cir. April 29, 1991).

4. To prevent the unjust enrichment of an infringer, it is clear that "if the infringer makes greater profits than the copyright owner lost, because the infringer is a more efficient producer than the owner or sells in a different market, the owner is allowed to capture the additional profit even though it does not represent a loss to him." *Taylor*, 712 F.2d at 1120. Thus, if Alexander would have made one dollar per book in royalties if he had made the lost sales and defendants made three dollars a book from sales to the custom-

■ In this case, Alexander has not sought any damages under the Copyright Act distinct from defendants' profits. Yet, the jury's award to plaintiffs represented an award for actual damages. The question, then, is whether the jury's damages award fully compensated Alexander for the injury that would be redressed by an award of defendants' profits under the Copyright Act. If the jury's award represented such a full recovery, then an award of defendants' profits is only available to the extent necessary to prevent the unjust enrichment of defendants, i.e., to the extent that defendants' profits have been shown to exceed the damages award.

As noted above, the jury awarded $16,175.50 to plaintiff Alexander on his breach of contract claim and $57,750 to plaintiffs jointly on their tortious interference claim. The jury's award of $16,175.50 to Alexander for his breach of contract claim reflected the amount of royalties he was due from defendants' sales of the *Ghosts* book after Alexander terminated his contract with defendants in April 1997. Specifically, these royalties stemmed from the 17,379 copies of *Ghosts* that defendants sold between June 30, 1997 and December 31, 1998.[5]

The precise injury redressed by the jury's tortious interference award is less clear. The award was based on plaintiffs' claim that Modrak interfered with their contracts and business expectancies with booksellers. The crux of the claim was that in August 1998, Modrak sent letters to booksellers stocking *Ghosts Revisited,* in which he claimed that Schiffer Publishing had no right to publish the book. These letters caused booksellers to return the copies of *Ghosts Revisited* they had ordered and make no further purchases. Thus, Alexander's actual damages arguably flowed from two separate injuries: the royalties that were lost as a result of Modrak's infringing sales (since presumably every customer who bought a copy of *Ghosts* was a customer who otherwise would have purchased *Ghosts Revisited*) and the royalties that were lost as a result of Modrak's letters to booksellers (which caused bookstores to stop stocking *Ghosts Revisited*). If the jury's tortious interference award were based solely on the damages suffered by Schiffer Publishing and Alexander as a result of the letters to booksellers, then an award to Alexander of the profits defendants received from selling the more than 17,000 infringing copies of *Ghosts* would not represent a double recovery; it would compensate for an injury not previously redressed, namely, the sales that Alexander lost as a result of defendants' infringement. The complexity lies in the fact that it is difficult to determine with certainty whether the jury meant to compensate Schiffer and Alexander for the sales lost to Modrak's infringing copies as well as the sales lost as a result of the letters to the booksellers through its award of $57,750. Nor do the jury instructions regarding tortious interference and the proper measure of damages answer the question definitively.[6]

ers they took from Alexander and Schiffer Publishing, Alexander would be entitled to receive the extra two dollars per book, even though he was not actually damaged in this amount.

5. Modrak paid Alexander royalties for sales made between April and June 1997, the two months immediately after the contract's termination; therefore, these royalties were not included in the jury's award. The $16,175.50 due for sales made after June 1997 were not, strictly speaking, appropriately awarded as breach of contract damages. Alexander's damages from Modrak's failure to make timely royalty payments would be any loss occasioned by the late royalty payments. No such loss was proved. Conceptually, the proper

way to have proceeded would have been for plaintiffs to seek a declaratory judgment that Alexander lawfully terminated the contract with Modrak based on Modrak's substantial breach and to seek to recover the $16,175.50 as copyright damages. Given the jury's resolution of the matter, however, the judgment will stand, and the amount of the award shall simply be deducted from the copyright damages otherwise due Alexander.

6. The jury was instructed regarding the measure of tortious interference damages as follows:

If you find wrongful interference with contracts or business relationships, you must then determine the amount the pre-

Instead, the answer must be found in the evidence presented by the plaintiffs, which made no, or at best, an imperfect distinction between the two species of lost sales, suggesting that the jury likely remedied both through its award. Thus, Peter Schiffer, president of Schiffer Publishing, testified that at the time he agreed to publish *Ghosts Revisited*, he expected sales of 10,000 to 20,000 copies a year. He further testified that Schiffer Publishing did not calculate profitability on a per copy basis, but stated that if Schiffer Publishing had sold 15,000 copies of the book, Alexander would have received between $3000 and $6000 in royalties. Finally, he testified that actual sales of *Ghosts Revisited* amounted to about 1,200 copies. In addition, Joseph Langman, a Schiffer Publishing employee, testified (i) that Schiffer Publishing experienced some initial success selling *Ghosts Revisited*, (ii) that after *Ghosts Revisited* was published he found copies of the defendants' *Ghosts* on the shelves of booksellers, and (iii) that because of the letters sent by Modrak's attorney and Alexander's attorney to booksellers, former customers of Schiffer Publishing refused to buy further copies of *Ghosts Revisited*.

If the jury based its damages award on the difference between Schiffer Publishing's expectation of sales of 10,000 to 20,000 copies of *Ghosts Revisited and Ghosts Revisited*'s actual sales of 1,200 copies, its award for tortious interference represented an award (to Schiffer Publishing and Alexander jointly) of between $3.07 and $6.56 per book sale lost, a reasonable calculation that is consistent with Modrak's testimony as to the amount he received per sale of *Ghosts* before payment of royalties and expenses. Thus, the record as a whole and the jury instructions point persuasively to the conclusion that the jury based its tortious interference award on the expectation of 10,000 to 20,000 *Ghosts Revisited* sales. While this expectation was clearly thwarted, two factors apparently contributed to the failure to achieve this level of sales. First, Modrak sold *Ghosts* to customers who would likely otherwise have bought *Ghosts Revisited* and second, Modrak's attorney sent letters to booksellers that caused them to stop buying *Ghosts Revisited*. Thus, the lost sales stemmed from both the letters and the *Ghosts* sales, and because these separate injuries are both represented by damage to Schiffer Publishing's expectation of selling 10,000 to 20,000 copies, both appear to have been fully redressed by the jury's award.

Yet, even if all of Schiffer Publishing's lost sales were redressed by the jury's tortious interference award, this does not conclude the matter. Alexander terminated his contract with defendants in April 1997. Schiffer Publishing did not begin to market *Ghosts Revisited* until August

---

vailing party is entitled to recover. You may award the following damages, to the extent they have been proven by the greater weight of the evidence: The monetary loss of benefits [of] a contract or business expectancy that was terminated or interfered with by the interfering party's actions, and the consequential losses which resulted from the interference.

Consequential losses are those that are incurred as an indirect result of the termination of a contract, or interference with a business expectancy. Recovery of damages may not be had for damages that are speculative or conjectural.

The jury had previously been instructed that wrongful interference with contracts or business relationships was shown when the claiming party proved

[f]irst, the existence of a valid contract or expectancy; second, the other party's knowledge of the contract or expectancy; third, the other party's interference with the contract or expectancy, with the intention of causing a breach of the contract or termination of the relationship; and fourth, damages resulting from the termination.

While these instructions certainly permit an award of damages suffered by Schiffer Publishing and Alexander as a result of defendants' letters to booksellers, they also arguably permit an additional award of damages suffered by Schiffer and Alexander when Modrak provided booksellers with infringing, unauthorized copies of the *Ghosts* book.

1998, after which defendants sold only 783 copies of *Ghosts*.[7] Thus, the great majority of defendants' infringing sales, 16,596 copies of *Ghosts*, were made prior to the publication of *Ghosts Revisited*. These pre-publication infringing sales, of course, do not represent lost sales to Alexander, since whether or not defendants sold the *Ghosts* book during this period, Alexander could not make any sales before Schiffer Publishing unveiled *Ghosts Revisited*. Thus, defendants' profits made from these sales are not "taken into account" by any computation of Alexander's actual damages, including tortious interference damages. As a result, these' profits are properly awarded to Alexander under § 504(b) of the Copyright Act, to prevent defendants' unjust enrichment. *See generally Richmond Homes Mgmt. v. Raintree, Inc.*, 862 F.Supp. 1517, 1528 (W.D.Va.1994). In contrast, the sales made by defendants after the publication of *Ghosts Revisited* to the identical customer base addressed by *Ghosts Revisited* must necessarily have resulted in lost royalties to Alexander, which lost royalties were apparently remedied by the jury's tortious interference award restoring Schiffer Publishing and Alexander to the place they would have been had they sold 10,000 to 20,000 copies of the book, as expected. Since Alexander and Schiffer Publishing have received actual damages to redress these lost sales, any further award of defendants' profits would result in double counting, unless defendants' profits were greater per book than the profits Alexander and Schiffer Publishing lost per lost book sale. There is no indication in the record that this is the case.

Thus, under § 504(b), Alexander is entitled to an award of defendants' profits from those sales of *Ghosts* made after April 1997 and before the publication of *Ghosts Revisited* in summer 1998.

## III.

This conclusion requires a determination of the proper measure of profits due Alexander. As noted above, § 504(b) provides that "in establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Alexander calculates defendants' gross revenue by multiplying total copies of books sold by $6.14 (which he calculates as the average wholesale price per copy). He then deducts an average printing cost of $2.04 per book and the royalties due to Alexander during the relevant period.[8] Alexander further argues that Modrak is entitled to no deduction for overhead, despite Modrak's testimony that such overhead generally amounted to about $1.15 per book sold, since these overhead expenses were not specifically proven and because Modrak failed to show how these overhead expenses specifically contributed to the production of the infringing products.

Defendants, not surprisingly, make various objections to these calculations. First, they dispute Alexander's calculation of $6.14 as the average wholesale price of the books sold during this period. Alexander cites to Plaintiffs' Exhibits 19–21 and Modrak's testimony for this figure. The cited exhibits are royalty calculations based on

**7.** This calculation is based upon the royalty statement for July 1, 1998, through December 31, 1998, which shows that Modrak sold 1,495 copies during this period. In addition, Modrak's Accounts Receivable Journal shows that he took in $14,700 during this period, of which $7,700, or 52%, was received between August 1 and December 31, 1998. Assuming that 52% of the 1,495 books were therefore sold between August 1 and December 31,

1998, 783 copies of *Ghosts* were sold after *Ghosts Revisited* came on the market.

**8.** By this calculation, Alexander contends that defendants' profits total $70,528.21. Even assuming that Alexander's figures for gross revenue and cost per book are correct, his total is nonetheless incorrect as it impermissibly includes defendants' profits after the publication of *Ghosts Revisited*, which, as noted above, would result in double counting.

the retail price of the book and the numbers of books sold, and shed little light on the *average* wholesale price of the books during the pertinent period. On the other hand, Modrak's testimony is more persuasive on this point. He testified that defendants sold all their books wholesale at a price discounted 44% to 52½ from the $10.95 retail price.[9] The average discount, he testified, was between 46% and 47%. Given this, the average wholesale price for the books during the relevant period would be $5.86, not $6.14.

Next, defendants correctly point out that Modrak repeatedly testified that printing costs were in fact $2.40 per book, a calculation supported by the printer's bill (introduced as an exhibit at trial), and that the single time he stated that his printing costs were $2.04 per book, he did so in response to a leading question of plaintiffs' counsel that so estimated the cost. Thus, on this record, the correct deduction for printing costs is $2.40 per book.

Defendants then argue that Alexander has failed to substantiate his assertion that defendants made sales totaling $28,964.67 between April 21, 1997, and June 30, 1997. The basis for Alexander's claim of sales in this amount during this period is the "Sales and Receivables Journal" that is Plaintiffs' Exhibit 50. Yet, as defendants point out, the journal does not record sales made in a particular time period, but rather shows revenues received during that time period, regardless of when the underlying sale was made.[10] Ultimately, defendants fail on this point. As the Copyright Act provides, to prove defendants' profits, a plaintiff is only required to show defendants' gross revenues. It is then defendants' burden to demonstrate deductible expenses and that portion of revenue not attributable to infringement. Thus, Alex-

ander has met his burden by demonstrating defendants' gross revenue during the period of infringement. It is defendants' burden to come forward with evidence showing that some of that revenue flowed from non-infringing sales of *Ghosts, i.e.,* sales made before the termination of the contract. They have failed to meet this burden.

Defendants further contend that they should be permitted to deduct overhead costs from their gross revenues in determining profits, based on Modrak's unrebutted testimony that overhead averaged $1.15 per book. Alexander, however, correctly and persuasively points to case law indicating that before a defendant may deduct overhead, he has the burden of "proving that each item of general expense contributed to the production of the infringing items in issue and of further offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue." *In Design v. K–Mart Apparel Corp.,* 13 F.3d 559, 565–66 (2d Cir.1994) (quoting *Nimmer on Copyright* § 14.03(b)). Thus, a deduction for overhead is only permitted when "the infringer can demonstrate it was of actual assistance in the production, distribution, or sale of the infringing product." *Kamar Int'l, Inc. v. Russ Berrie and Co.,* 752 F.2d 1326, 1332 (9th Cir.1984). Modrak's testimony gave few details about what his overhead costs might be: he testified that he rented a storage locker in which to keep books and that he made his own deliveries of books. He also testified that when he first republished *Ghosts,* he had various editorial expenses, but as plaintiffs point out, these were one time expenses incurred in 1989, long before the infringing copies were printed and sold. While "absolute certainty ... is not required,"[11] defendants have not here estab-

---

9. Defendants suggest that the average wholesale price should be further adjusted, as some books were sold for a retail price of $9.95 during this period. The record indicates, however, that beginning March 1, 1997 (more than a month before the termination of the publishing contract), the books were regularly sold at retail for $10.95.

10. Thus, if a vendor sold books in 1996, but did not pay for these books until 1997, the journal would show the revenue in 1997, though it actually flowed from 1996 sales.

11. *In Design,* 13 F.3d at 566.

lished overhead expenses with sufficient precision to allow their deduction from profits.

Defendants' profits therefore are $3.46 ($5.86–$2.40) per book sold between the date of Alexander's termination of the contract and the publication of *Ghosts Revisited*, less royalties actually paid to Alexander for sales made during this period and less the jury's breach of contract award, representing royalties due. As stated above, Modrak sold 17,379 copies of *Ghosts* between June 30, 1997, and December 31, 1998. Of these, 16,596 were sold prior to the time *Ghosts Revisited* came on the market. In addition, the record indicates that 4,893 copies of *Ghosts* were sold between April 21, 1997, and June 30, 1997.[12] Thus, 21,489 copies of *Ghosts* were sold within the relevant period. Multiplying this figure by $3.46 yields profits in the amount of $74,351.94. From this figure is subtracted the jury's $16,175.50 "breach of contract" award, representing royalties due from June 30, 1997, to December 31, 1998, and $4,554.16 for royalties actually paid to Alexander for defendants' sales made between April 21, 1997, and June 30, 1997, yielding a total copyright damages award of $53,622.28.

## IV.

■ Alexander seeks attorney's fees, the award of which lies in the trial court's discretion. *See* 17 U.S.C. § 505; *Diamond Star Bldg. Corp. v. Sussex Co. Builders, Inc.*, 30 F.3d 503, 506 (4th Cir. 1994). The Fourth Circuit has identified four factors trial courts must consider when determining attorney's fees under section 505:(1) "the motivation of the parties"; (2) "the objective reasonableness of the legal and factual positions advanced"; (3) "considerations of compensation and deterrence"; and (4) "any other relevant factors presented." *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 234 (4th Cir. 1993).

■ In this instance, attorney's fees should not be awarded. The first factor requires consideration of willful infringement, bad faith, or maliciousness on the part of the non-prevailing party. *See Diamond Star*, 30 F.3d at 506; *Superior Form Builders v. Dan Chase Taxidermy Supply Co., Inc.*, 881 F.Supp. 1021, (E.D.Va.1994) (first factor met by a jury finding of willful infringement), *aff'd*, 74 F.3d 488 (1996). In this case, the record does not support a finding that defendants willfully infringed Alexander's copyright, nor is there evidence in the record of defendants' bad faith or maliciousness.

Second, the defendants' legal and factual arguments were objectively reasonable, even if unpersuasive. The defendants' contention that Alexander, through repeated acceptance of late payments, had waived his right to demand prompt payments without notice, was neither frivolous, nor wholly without a legal basis. *See Superior Form Builders v. Dan Chase Taxidermy Supply Co., Inc.*, 74 F.3d 488, 498 (4th Cir.1996) (pursuit of claim in bad faith as a basis of attorney's fees); *Diamond Star*, 30 F.3d at 506 (frivolous claim as a basis of attorney's fees).

Third, consideration of compensation and deterrence does not suggest that attorney's fees are appropriate. The damages award adequately compensates Alexander for his loss due to the defendants' copyright violation. Furthermore, attorneys' fees are not an appropriate element of compensation because, as discussed above, the defendants' legal claims were objectively reasonable. Defense of reasonable legal claims, under the so-called "American rule," is in most instances a cost of business. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533–34, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). Attorney's fees are also not appropriate here as the facts at bar do not call for deterrence of future frivolous claims or infringing conduct. *See*

---

12. This calculation is arrived at by dividing the $28,965.57 of revenue for that period by the average wholesale price of $5.86 per book, and then subtracting 50 books to account for lost books and other sources of "shrinkage."

*Superior Form,* 74 F.3d at 498 (copyright infringement appeared to be a regular practice of the defendant's business); *Diamond Star,* 30 F.3d at 506 (pursuit of a frivolous claim). Defendants' legal and factual claims were not frivolous, and defendants' breach of contract does not indicate a likelihood of future copyright infringement, or that copyright infringement was an element of defendants' business practice. Finally, there are no other factors that suggest attorney's fees are appropriate in this case.

### V.

Finally, Alexander seeks injunctive relief, including the turn-over or destruction of all copyrighted materials, pursuant to 17 U.S.C. §§ 502 and 503(b). The Copyright Act gives the trial court authority to "order the destruction or other reasonable disposition of all copies ... found to have been made or used in violation of the copyright owner's exclusive rights, and of all plates, molds, matrices, masters, tapes, film negatives, or other articles by means of which such copies ... may be reproduced." 17 U.S.C. § 503(b). Consistent with this provision and to insure against any future infringement of Alexander's copyright, defendants will be ordered to destroy the remaining copies of *Ghosts,* and the printing negatives and plates used to produce the book. Defendants will further be ordered to certify to the Court and to Alexander by suitable affidavit that the destruction has been completed.

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record. An appropriate order will enter.

### FINAL JUDGMENT

THIS ACTION came on for trial on June 28–30, 1999, before the Court sitting with a jury. At the close of all the evidence the Court denied the parties' cross-motions for judgment as a matter of law pursuant to Fed.R.Civ.Proc. 50(a). The parties then stipulated that issues arising under the Copyright Act, 17 U.S.C. § 101 *et seq.,* would be submitted to the Court for determination, an award of damages, if any, and other relief in a manner consistent with the jury's determination of issues relating the claims of breach of contract and tortious interference with contract and prospective business relationships. The plaintiffs also dismissed their claims of unfair competition under the Lanham Act, 15 U.S.C. § 1125, and common law.

The parties' claims and counterclaims for breach of contract and tortious interference were submitted thereupon to the jury, which found its verdict in favor of the plaintiffs as to Counts II and IV of the Complaint, and awarded them damages.

The foregoing considered, and the Court having considered the parties' post-trial memoranda concerning the appropriate nature and measure of relief to which plaintiff may be entitled under the Copyright Act, and for the reasons set forth in the Memorandum Opinion of this date, it is hereby

ORDERED that plaintiff John N. Alexander shall recover of the defendants, and each of them, the sum of Sixteen Thousand One Hundred Seventy–Five and 50/100 dollars ($16,175.50) as and for his damages for breach of contract under Count II of the Complaint; and it is further

ORDERED that plaintiffs John N. Alexander and Schiffer Publishing, Ltd., jointly and severally, shall recover of the defendants, and each of them, the sum of Fifty Seven Thousand Five Hundred Dollars ($57,500.00) as and for their damages for tortious interference under Count IV of the Complaint; and it is further

ORDERED that plaintiff John N. Alexander shall recover of the defendants, and each of them, the sum of Fifty Three Thousand Six Hundred Twenty–Two and 28/100 dollars ($53,622.28) as and for his damages for copyright infringement pursuant to 17 U.S.C. § 504(a) under Count I of the Complaint; and it is further

ORDERED that Counts III, V and VI of the plaintiffs' Complaint, and defen-

dants' Counterclaim, are dismissed with prejudice.

IT IS FURTHER ORDERED, pursuant to 17 U.S.C. § 502, that defendants, their officers, directors, employees, servants, agents, attorneys and all persons in active concert or participation with them, are permanently enjoined and restrained from any act in furtherance of the printing, publication, reproduction, distribution, sale or offering for sale or other use of the work entitled *Ghosts: Washington's Most Famous Ghost Stories*, or any work derived therefrom, including any audio or video recording thereof.

IT IS FURTHER ORDERED, pursuant to 17 U.S.C. § 503, that defendants shall destroy the infringing materials remaining in their possession, including all copies of *Ghosts: Washington's Most Famous Ghost Stories* and printing negatives and plates used to reproduce the book, and to certify to the Court and to Alexander by suitable affidavit that the destruction has been completed.

The Clerk is directed to forward copies of this Order to all counsel of record and to enter judgment for the plaintiff pursuant to Rule 58, Fed.R.Civ.P.