**In re Christopher Rdell WEAVER, a.k.a. CR Weaver, a.k.a. Art Weaver, Debtor.**

**In re MWM, INC., a Montana Corporation, Debtor.**

**Christopher Rdell WEAVER, Plaintiff.**

**v.**

**BURGER KING CORPORATION, Defendant.**

Bankruptcy Nos. 96–52462–11, 96–52463–11.

Adversary No. 97/00104.

United States Bankruptcy Court, D. Montana.

March 30, 1998.

892

Kenneth E. O'Brien, Gregory E. Paskell, Kalispell, MT, for Plaintiff/Debtor.

Charles W. Hingle, Dorsey & Whitney, L.L.P., Billings, MT, Paul P. Daley, Hale and Dorr, L.L.P., Boston, MA, for Defendant.

## *ORDER*

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 11 case, the Debtor Weaver [1] seeks confirmation of an Amended Chapter 11 plan which Debtor concedes cannot be confirmed unless the Debtor's Objection to the amount of the Proof of Claim of Burger King Corporation ("BKC") is sustained, so that such claim is reduced by over one million dollars. Toward that confirmation goal, the Debtor Weaver filed Adversary Proceeding 97/00104 seeking an independent determination by the Court under F.R.B.P. 9034, which incorporates (with exceptions not applicable to this proceeding) Fed. R.Civ.P. 60(b). After the adversary proceeding was placed at issue, trial of the matter was held on January 6, 1998, with each party represented by respective counsel of record. Testimony was taken from Weaver, accountant Guy LaVoie and BKC counsel Howard Wolfsom. Plaintiff's Exhibits 1 and 2 and Defendant's Exhibits A through F were admitted without objection. At the conclusion of the evidence, the record was kept open to allow further testimony of Robert M. Einhorn, Weaver and LaVoie, and exhibits to be submitted by deposition. The record now having been completed and the parties having

---

1. The Chapter 11 cases of Weaver (96–52462–11) and MWM, Inc. (96–52463–11) have been consolidated and thus, this Order applies to each Chapter 11 case.

submitted briefs in support of their respective positions,[2] the matter is ripe for decision. Since it is clear from the transcript of record made at the January 6, 1998, hearing that the confirmation of a plan of reorganization in the consolidated cases depends entirely on the final decision in the adversary proceeding contesting the amount of BKC's Proof of Claim,[3] the Court will thus decide the merits of the adversary proceedings in this order, from which will follow a separate Order on the confirmation of the Amended Chapter 11 plan of reorganization. The BKC amended Proof of Claim, as filed, is unsecured in the sum of $3,280,789.84. The Debtor seeks a reduction in the sum of $1,267,293.90.

## BACKGROUND

This background is taken from two Orders entered on September 4, 1996, and October 23, 1996, by the United States District Court, Southern District of Florida, in Case No. 90–2191–CIV–Marcus, entitled "Burger King Corporation, Plaintiff v. C.R. Weaver and MWM, Inc., Defendants" (the "Florida case"). That action arose out of franchise agreements between BKC and the defendants involving two Burger King restaurants in Great Falls, Montana, denoted as restaurant # 1666 and restaurant # 6158.

The restaurant agreement for # 1666 was executed May 24, 1976, and then assigned, with consent of BKC in August of 1976, to MWM, Inc., a corporation in which Weaver, the Debtor here, owned 80% of the outstanding stock. Under the assignment, Weaver guaranteed the performance of the terms of the agreement, thereby remaining jointly and severally liable with MWM, Inc. The franchise agreement for restaurant # 6158 was executed September of 1988. A dispute arose between the parties over the location

by BKC of another Burger King franchise in Great Falls in 1989, whereby starting in the fall of 1989, the Debtor withheld making royalty, franchise fees and rent payments to BKC for the two restaurants—# 1666 and # 6158—which constituted a default under each franchise agreement. Thereupon, on September 10, 1990, BKC advised Weaver in writing demanding full payment, and when no payment was made, in separate written notices dated December 7, 1990, BKC informed Weaver it had terminated both franchise agreements. By the date of September 4, 1996, Order of the Florida District Court, Weaver had continued to operate "purported" BKC franchises at the sites of restaurants # 1666 and # 6158.

BKC sued Weaver on September 21, 1990, asserting claims for breach of contract, violation of the Lanham Act, common law trademark infringement and common law unfair competition. BKC sought not only injunctive relief but also money damages from Weaver and MWM, Inc. Weaver answered and filed a sixteen count counterclaim asserting BKC breached each franchise agreement by allowing the placement of a new restaurant in the same market at Malmstrom Air Force base, which was opened pursuant to BKC's national contract with the United States Armed Forces. Weaver asserted compensation for "encroachment" of the new restaurant on Weaver's businesses.

After procedural skirmishes in the Florida federal action, the matter finally resulted in a grant of summary judgment for BKC, and dismissal of all of Weaver's claims in a detailed Order filed September 4, 1996. The District Court then scheduled a pre-trial conference for September 18, 1996, to discuss the issue of damages. While the parties at that conference, with Weaver in attendance,

---

**2.** Debtor's counsel submitted an opening and response brief, but captioned each brief under the Chapter 11 case number rather than the adversary proceeding where they were filed by the Clerk. While it makes the record cumbersome and confusing, the Court considers each brief as argument in support of the Plaintiff's Complaint filed in the Adversary Proceeding.

**3.** Pages 45–46 of the Trial Transcript read:
THE COURT: And as far as the approval of the amended Disclosure Statement and the plan of

reorganization, I think that necessarily is going to determine what we do in this claims process, is it not?
MR HINGLE (BKC): Well, I believe that Mr. Weaver's counsel has admitted in the most recent filing that the plan is unconfirmable.
MR O'BRIEN (Debtor): Your Honor, we would certainly agree that if we do not obtain the relief that we are seeking with respect to the claim that there are not sufficient funds to fund the plan at the two million plus.

agreed that the calculation of damages were a matter of mathematics based on the sales figures of each restaurant, the crux of the damage issue evolved around a legal issue as to whether BKC was entitled to an accounting of the profits of each restaurant. After the filing of proposed findings of facts and conclusions of law by each party, the Florida District Court then issued the Order filed October 23, 1996. After reciting the pertinent facts, the District Court concluded:

> For all of the foregoing reasons, BKC is entitled to an accounting of Weaver's profits between December, 1990 and the present. As noted above, both the language of section 1117(a) [4] and the case law of this Circuit makes clear that courts are vested with considerable equitable discretion in determining the measure of damages for trademark infringement. *See Ramada Inns [v. Gadsden Motel Co.]*, 804 F.2d [1562] at 1564 [(11th Cir.1986)] (noting that "[g]reat latitude is given the trial judge in awarding damages, and his judgment will not be set aside unless the award is clearly inadequate," and adding that "[t]his is especially true of an award fashioned pursuant to the Lanham Act which expressly confers upon district judges wide discretion in determining a just amount of recovery for trademark infringement"). Exercising our discretion to order an accounting of profits is appropriate based on Weaver's unjust enrichment, the necessity of deterrence and persuasive evidence that Weaver's infringement qualifies as willful and deliberate. The Defendants offer no compelling factual or legal grounds to support their argument that an accounting of profits would be an abuse of discretion under these circumstances.

However, in the Florida case, the record is clear that the Court never tried the issue as to the *amount* of the damages. Rather, a final judgment was submitted to the District Court based upon stipulation of the parties as to the amount of damages. That matter was entered by Order dated October 22, 1996, reciting "the parties having agreed to the amount and computation of Plaintiff's damages under Counts I through VI of its Amended Complaint and the amount of Defendant's profits to be awarded to Plaintiff as an accounting under 15 U.S.C. § 1117, and that Judgment should be entered in favor of Plaintiff and against Defendants C.R. Weaver and MWM, Inc. jointly and severally, in the amount of $2,607,481.04, and in favor of Plaintiff and against Defendant C.R. Weaver individually in the additional amount of $2,386,043.93, all of which is set forth below...".

The reason for the two separate amounts is that the former sum derives from restaurant #1666, while the second sum derives from restaurant #6158. During the course of the litigation, pursuant to Court order, Weaver and MWM, Inc. had made deposits into the court registry for royalties on both restaurants and rent (8.5% of sales) on restaurant #1666. See Final Judgment, page 5–6. Those sums, less $15,000 credited as an offset, were ordered paid over to BKC, thereby partially satisfying the judgment to the amount of BKC's Proof of Claim. This brings us to the present challenge by Weaver to the amount of BKC's Proof of Claim in this Chapter 11 case.

4. The language of the Lanham Trademark Act, 15 USCA § 1117(a) cited above, states in pertinent part:

> When a violation of any right of the [trademark registrant]...shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled...subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

## ADVERSARY PROCEEDING
## NO. 97/00104

Before entering into the stipulated judgment concerning the amount of the damage award, Weaver's accountant and bookkeeper had submitted, through Weaver's Florida counsel, the copies of the 1990–1995 income tax returns and 1996 ledger sheets for Weaver and MWM. Those documents were in turn delivered to BKC's accountant Stanley Gettis ("Gettis") to calculate the amount of profits earned at restaurants # 6158 and # 1666. Gettis reviewed the documents, and filed an affidavit concerning his results (Tr. Exhibit "D"). Gettis had previously filed an affidavit in the Florida Case (Ex. D), stating he calculated the profits made by the defendants at each of their terminated Burger King franchises (# 1666 and # 6158) from January 1, 1991, through August 31, 1996, adding back to the stated net income (a) "salary" paid to Weaver at restaurant # 1666, (b) payments to Weaver's medical insurance out of restaurant # 1666 profits and (c) monies paid to various of Weaver's attorneys out of each restaurant's profits to fund the defense of this action.[5] That was the calculation that was laid before the parties and formed the basis of the Final Judgment. Appeal of that Judgment was taken November 18, 1996.

The Debtors (Weaver and MWM, Inc.) now contend that Gettis's calculations were based on mistakes in three areas from which the Court should reduce the Final Judgment. We take them up in seriatim:

### 1. Rental Income.

The record shows that Weaver's bookkeeper in preparing the monthly income and expense statements for restaurant # 6158 line itemed a deduction of 8.5% of the gross income as "rent." For example, in Exhibit D

(Gettis Affidavit), a profit and loss statement for Store # 6158 shows food sales of $94,-205.64 and a rent deduction of $8,007.48, being 8.5% of the sales. However, Debtor's accountant, Guy LaVoie, explained at the January 6, 1998, hearing, that, as to Store # 6158:

"When I received the paperwork from his bookkeeper in Great Falls, there was the rental expense shown on their financial statement and I would make an adjusting journal entry that would debit his equity as a draw account for that amount and credit—rent expense. If effect, that eliminated the expense from the financial statement and ultimately raised the net income by that amount." TR. 21.

LaVoie explained he did not leave it as a rent expense in preparing income tax returns because store # 6158 was operated as a sole proprietorship, and the Internal Revenue Code does not allow an individual to pay himself rent. According to Weaver, he never learned of such adjustment until October of 1997. TR. 13. The evidence further shows that the Gettis calculations used the income tax returns to prepare the accounting thereby not including the 8.5% of gross sales as rent, but did allow the rent expense of 8.5% of sales for the year 1996 because the tax returns had not yet been prepared before Final Judgment, so the only data available was the bookkeeper's monthly profit and loss reports. Exhibit D. Further, Debtor's Florida counsel testified by deposition that he was unaware that the rental for store # 6158 had been added back into the net income figures by LaVoie, and that had he known such fact, he would not have agreed to the stipulation. (Einhorn Deposition p. 15 and 113). The 1996 deduction conceded by BKC amounted to $87,103.00.[6] According to LaVoie's depo-

---

**5.** Florida counsel for BKC testified at the January 6, 1998, hearing:

In a trademark infringement case under section 35 of the Lanham Act, which is, I think 15 U.S.C. 1117, the parties asserting the claim can rest simply by submitting the infringee's gross sales or gross profits. It's then the infringer's burden, if he believes there are proper deductions, to come forward with those deductions.

As noted, Section 1117(a) states that in assessing profits, the plaintiff should be required to prove

the defendant's sales only, defendant must prove all elements of costs or deductions claimed.

**6.** Footnote 8 in BKC's February 23, 1998, memorandum in support of its motion for summary judgment states:

It appears that one (1) mistake was made when the Final Judgment was entered. Since no financial statements were available for # 6158 for the period of January through August 1996, the parties, Mr. Gettis and the District Court relied on monthly profit and loss statements

sition testimony (which corrected the transcript record) the total allowable deduction for rent equals $652,688.77, including interest. Deposition Exhibit N. This calculation includes 8.5% of all sales for the years 1991–1995, plus interest. It is the position of Debtor that, notwithstanding application of the Internal Revenue Code, rent is a proper deduction from gross sales under the Lanham Act.

For its part on this issue. BKC states Debtor's counsel Einhorn learned about the add back adjustment for rent at the time he deposed Gettis on November 21, 1995, when Gettis testified:

Q. [Mr. Einhorn]. There is no adjustment for rent on this Exhibit. Can you tell me why?

A. [Gettis]. Yes, the reason there is not rent add-back is because the operating entity owns the land and building that it operates from. So, the depreciation is reflected as an operating expense, and again, I was charged with computing profits before any payments to Weaver.—in that is that of the property...if the entity owned the land and building, there would be no add-back because there was no payment to Weaver.

Deposition p. 42–43.

This testimony is based on Gettis's calculation taken from the 1991–1995 income tax returns prepared by LaVoie on store # 6158. In sum, BKC allowed a deduction for depreciation of the building and land as an expense, but not for rent for the years 1991–1995. Gettis fixed the total net profits for store # 6158 at $1,446,111 for years 1991–1995. Gettis's Deposition–Exhibit J. Gettis, by affidavit, then explained that he updated Exhibit J to include the 1996 period (8 months) based on the bookkeeper's monthly reports, and allowed each line item expense, including the rent of 8.5% of sale, because he "assumed [it] was not rent being paid by Mr.

which were apparently prepared by a bookkeeper, not Mr. LaVoie. These monthly P & L's included a line for "rent" which neither Mr. Gettis or BKC understood was rent purportedly paid by Mr. Weaver to himself. Mr. Gettis accepted all of the expense items in the monthly P & L's in calculating the trademark

Weaver to himself since this would make no sense and since no rent appeared in the financial statements prepared by Kettinger and LaVoie for 1991 through 1995." A review of the bookkeeper's monthly profit and loss statements through August 31, 1996, for store # 6158 show a deduction for depreciation of 1.31% totaling $12,000 as well as a rent deduction of $77,681.32. Obviously, Gettis never inquired of anyone as to any operating expense deductions for this period. Gettis Affidavit, ¶ 8.

### 2. 80% ownership of MWM, Inc.

The second item which the Debtor contests is that Gettis never reduced Weaver's profit on store # 1666 by 20% to reflect that Weaver was only an 80% owner of MWM, Inc., a sub-Chapter S Corporation which owned and operated store # 1666. It is a given that the Florida District Court Judgment based on Gettis's calculations assumed Weaver owned 100% of that company and therefore, 100% of the profits. LaVoie's corrected deposition testimony [7] fixed the overcharge at $221,108.90 plus accrued interest.

The income tax returns supplied by LaVoie to Gettis plainly reveal for each year, in Schedule K–1, and in the Montana Small Business Corporation Returns, that the shareholders of MWM, Inc. were C.R. Weaver, owning 80% and Matthew Blazicevich owning 20%. BKC Exhibit D. Thus, argues the Debtor, the Judgment is clearly based on a mutual mistake of fact and should be accordingly reduced by $221,108.90. The facts are conceded by BKC as to ownership, but, for its part, BKC states, so what, the Florida District Court Judgment is joint and several against both Weaver and MWM, Inc., so under the Lanham Act, a 100% recovery of profits from the joint defendants is correct.

### 3. Income Tax Liability by Debtors.

Debtor, on this issue, posits an argument that was never raised by anyone before the

infringement profits for 1996 at # 6158. This resulted in a deduction of $87,103 and an understatement in the Final Judgment of the same amount plus interest.

7. LaVoie's trial testimony and Exhibit 2 fixed the sum at $268,558.44.

entry of the Florida District Court Judgment. Debtor's evidence, through LaVois by deposition, is that the profit assessed against Weaver for stores # 1666 and # 6158 would be subject to federal and state income taxes, but that Gettis made no such deduction in computing the damages. Debtor's evidence is that the federal and state income taxes based on the profits for stores # 1666 and # 6158 as calculated by Gettis would have been at least $393,496.26, if only the two stores' profits were used, and $910,619.00 if all of Weaver's income from all sources was used. LaVoie Deposition pp. 26–27; Exhibit "2".

Einhorn testified that the income tax consequences as a legitimate Lanham Act deduction were overlooked mistakenly by both parties. Einhorn Deposition pp. 19–20.

In response. BKC does not contest LaVoie's calculations based on income tax liability for both stores. BKC counters that irrespective of LaVoie's evidence, the record shows that for the years in question. Weaver never paid anywhere near the amount of such taxes based on the pertinent income tax returns, and in fact in some years never paid any taxes at all due to deductions and losses for other allied financial interests.

## ISSUES

BKC has postured the following issues why the pending adversary proceeding should not afford any relief against its proof of claim. First, BKC states the Debtor should return to the District Court in Florida for relief since Fed.R.Civ.P. 60(b) cannot and should not be applied in this proceeding. Second, BKC contends that if this Court reaches the merits, each of the proposed reductions against the proof of claim are without factual or legal basis and arise as a result of the Debtor's neglect at the time the stipulated judgment was agreed upon.

*Remedy Under Fed.R.Civ.P. 60(b)*

As a preface to a holding on the issue of whether Rule 60(b) should be applied under the facts of this case, it must be noted that

this proceeding is ancillary to a case filed under chapter 11 of the Bankruptcy Code, where the distressed debtors seek reorganization of all of their outstanding obligations, not only the large unsecured claim of BKC, in order to retain significant financial interests to fund the plan.[8] The entire confirmation process is guided by the admonition of the United States Supreme Court in *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988), "that there must be a 'reasonable possibility of a successful reorganization within a reasonable time.'" Indeed, the Bankruptcy Code itself provides a timetable of action by allowing the debtor only a four month exclusivity period to file a plan of reorganization, after which any party-in-interest may file a plan. 11 U.S.C. § 1121(b).

 It is further noted that the Florida District Court case is on appeal to the United States Court of Appeals of the Eleventh Circuit. Of course, the filing of a notice of appeal divests the district court of jurisdiction. *Scott v. Younger,* 739 F.2d 1464, 1466 (9th Cir.1984). Unless the appellate court remands to the district court, the latter is without jurisdiction to consider motions to vacate judgments. *Bruce v. United States,* 759 F.2d 755, 757 (9th Cir.1985). To allay such cumbersome and time consuming procedural delays, the United States Supreme Court, recognizing that the appellate leave requirement adds to the delay and expense of litigation, held in *Standard Oil Co. of California v. United States,* 429 U.S. 17, 18–19, 97 S.Ct. 31, 32, 50 L.Ed.2d 21 (1976), that Rule 60(b) is a proper vehicle to seek independent relief even while a case is pending on appeal, so that leave of the appellate court is not required. More important to the case *sub judice* is that, as I read the designation of issues on appeal, the defendants (Weaver and MWM, Inc.) have not raised an issue as to the *amount* of the stipulated judgment, but only as to legal basis given by the Florida District Court as to what elements the judgment may properly include. Indeed,

---

8. The Amended Disclosure Statement lists impaired secured claims in the sum of $188,000, and unsecured claims in the amount of $60,400

in addition to the unsecured claim of BKC in the sum of $3,267,000.

that was the entire basis of the October 23, 1996, order of the Florida District Court.

■ Next, it is the fact that after the entry of the Florida judgment on October 23, 1996, the Debtors filed for Chapter 11 relief in this Court, thereby foreclosing a registration of the Florida Judgment in this District pursuant to 28 U.S.C. § 1963. BKC would have to seek relief from the automatic stay to do so now. However, despite such lack of formal registration of the Florida judgment, when the Debtors filed for Chapter 11 relief and duly scheduled the BKC claim (albeit as unsecured), the Debtors in effect acknowledged such claim and thus in effect registered the claim in this Court. F.R.B.P. 3003(b)(1) provides that the schedule of liabilities filed in a Chapter 11 case pursuant to § 521(1) of the Code "shall constitute prima facie evidence of the validity and amount of the claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated", in which event the creditor must then file a claim under Rule 3003(c)(2).

The Debtor scheduled BKC's claim as disputed and contingent (obviously because of the appeal) but did not challenge that the claim was unliquidated. BKC then responded by filing a liquidated claim. This challenge followed as to the *amount* for which the claim should be allowed. In effect then, we have a registered claim based on a judgment in another jurisdiction.[9]

The matter is put into proper perspective by the language of *F.D.I.C. v. Aaronian,* 93 F.3d 636, 639 (9th Cir.1996), which states by way of analogy to the case *sub judice:*

> Aaronian launched his attack on the decision in the court which registered the judgment rather than the court which rendered it. This does not defeat his claim. A court of registration has jurisdiction to entertain motions challenging the underlying judgment. *In re Joint E. & S. Dists. Asbestos Litig.,* 22 F.3d 755, 762 n. 15 (7th Cir.1994); *Covington Indus., Inc. v. Resintex A.G.,* 629 F.2d 730, 732 (2d Cir.1980) (citing *Baldwin v. Iowa State Traveling Men's Assoc.,* 283 U.S. 522, 525, 51 S.Ct.

517, 517–18, 75 L.Ed. 1244 (1931) and *Adam v. Saenger,* 303 U.S. 59, 58 S.Ct. 454, 82 L.Ed. 649 (1938)); *Indian Head Nat'l Bank of Nashua v. Brunelle,* 689 F.2d 245, 249–50 (1st Cir.1982); *but see In re Universal Display & Sign Co.,* 541 F.2d 142, 144 (3d Cir.1976). It makes no difference whether the challenge is brought via the procedure described in Rule 60, or some state law analogue to Rule 60, or under the court's inherent power to set aside a judgment in equity, a power Rule 60 explicitly preserves. *Indian Head,* 689 F.2d at 249–50; Fed.R.Civ.P. 60(b). The label affixed to the motion will not dictate the outcome of the registration court's decision. *Covington,* 629 F.2d at 733; *Bankers Mortgage Co. v. United States,* 423 F.2d 73, 77 n. 7 (5th Cir.1970) (independent action for relief may be treated as Rule 60(b) motion provided no prejudice ensues to opposing party). Our analysis therefore proceeds in the manner it would had Aaronian invoked Rule 60(b).

■ The *Aaronian* court, without deciding, did acknowledge the registering court has wide discretion to entertain a challenge to the underlying judgment, but such motions are disfavored, thereby preferring the matter be brought before the rendering court. *Indian Head,* 689 F.2d at 249–50. The deference standard is based on considerations of convenience, comity and efficient judicial administration of the case in the rendering court because of its familiarity with the issues. *In re Joint Eastern & Southern Dist. Asbestos Litig.,* 22 F.3d at 762–63. It should not be used as a substitute for appeal. *Id.* Here, the sound judicial administration of this Chapter 11 case dictates a prompt review and determination of the BKC claims on issues never raised at trial or decided by the Florida District Court due to the stipulated judgment. Moreover, a determination of the claim is expressly laid at the feet of the bankruptcy court pursuant to 11 U.S.C. § 502(b) ("[I]f such objection to a claim is made, the court, after notice and a hearing, *shall* determine the amount of such claim as

---

9. I believe this is a proper conclusion since, even though the procedure under 28 U.S.C. § 1963 was foreclosed, in the context of bankruptcy law, the foreign judgment was registered in this Court by the Debtor's Schedules.

of the date of the filing of the petition, and *shall* allow such claim in lawful currency of the United States in such amount ...") (Emphasis added).

Rule 3007 specifically governs the procedure for objections to claims, stating "If an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding."

Finally, allowing the court to decide the issues framed in this proceeding does not at all trample upon the standard of granting comity to the rendering court. As noted above, that decision is on appeal on issues wholly apart from the *amount* of the judgment, and that appeal can proceed in a normal manner. The decision to defer "merely assures that judicial resources are correctly allocated and that the litigant is not able to shop for a more favorable forum that may be more disposed to his claim because it is less familiar with it." *In re Joint Eastern & Southern Dist. Asbestos Litig., supra,* 22 F.3d at 763. I find the judicial resources of both courts are more effectively utilized by the prompt determination of the objections to the amount of BKC's unsecured claims, particularly where confirmation of the plan lies in the balance.

Finally, the proper venue for the reorganization effort under Chapter 11 is this District, which is where the Debtors reside, the assets are located and the creditors are present, including BKC which does substantial business in this District. All matters thus considered, this Court will proceed to determine the allowance of the BKC claim under Rule 60(b), applying, nevertheless, the legal standards which that rule demands.

■ As a preface to all three items of objections to the BKC Proof of Claim, I begin with the general rule of law regarding stipulated agreements between the parties and prospective relief therefrom under Rule 60(b). The Rule is stated in *Brown v. County of Genesee,* 872 F.2d 169, 173 (6th Cir. 1989), as follows:

**10.** Rule 60(b)(1) reads:
 On motion, and upon such terms as are just, the court may relieve a party or a party's legal

It is well established that a "court must enforce the settlement as agreed to by the parties and is not permitted to alter the terms of the agreement." *Brock v. Scheuner Corp.,* 841 F.2d 151, 154 (6th Cir.1988); *accord In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975,* 687 F.2d 626, 629 (2nd Cir.1982) ("It is beyond a district judge's discretion to alter the terms of or refuse to enforce a settlement agreement, absent special circumstances, such as a material breach of the agreement, ... or duress....") (citations omitted); *Kohr v. Allegheny Airlines, Inc.,* 504 F.2d 400, 405 (7th Cir.1974) ("[I]t was an abuse of discretion for the district court to effectively change the settlement from one providing for dismissal of plaintiffs' complaints with prejudice to one providing for the dismissal without prejudice."), *cert. denied sub nom. Forth Corp. v. Allegheny Airlines, Inc.,* 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975).

Discussing the application of Rule 60(b)(1),[10] the court in *Brown* holds:

In the instant case, however, the district court erroneously concluded that since a mutual mistake of material fact would suffice to warrant reformation of a settlement agreement, a unilateral mistake also constituted permissible reason to do so. Existing precedent, however, dictates that only the existence of fraud or mutual mistake can justify reopening an otherwise valid settlement agreement. "One who attacks a settlement must bear the burden of showing that the contract he had made is tainted with invalidity, either by fraud practiced upon him or by a *mutual mistake* under which *both parties acted.*" *Callen v. Pennsylvania R.R. Co.,* 332 U.S. 625, 630, 68 S.Ct. 296, 298, 92 L.Ed. 242. (emphasis added); *Asberry v. United States Postal Serv.,* 692 F.2d 1378, 1380 (Fed.Cir.1982) (same).

872 F.2d at 174.

11. Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and*

representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, —— or excusable neglect.

*Procedure: Civil 2d* § 2858 (2d ed.1995) p. 273–274 states discussing Rule 60(b):

> "Consent judgments have been reopened when they were agreed to because of erroneous factual representations. Similarly, judgments entered as a result of settlements may be reopened when fraud or mutual mistake is shown."

This mutual mistake rule has been followed in the Ninth Circuit in *Blair v. Shanahan,* 795 F.Supp. 309, 315 (N.D.Cal.1992), *modified on other grds,* 38 F.3d 1514 (9th Cir. 1994), *cert. denied,* 514 U.S. 1066, 115 S.Ct. 1698, 131 L.Ed.2d 561 (1995), where the court adopted with approval *Brown v. County of Genesee, supra* and *Mallory v. Eyrich,* 922 F.2d 1273 (6th Cir.1991), "both of which espoused the Sixth Circuit rule *that mistake must be mutual* for Rule 60(b) to provide relief."

The Debtor also argues that relief may be afforded under Rule 60(b)(5), citing *Johnson Waste Materials v. Marshall,* 611 F.2d 593 (5th Cir.1980). Debtor's argument is in opposition to BKC's stance that the Debtors are barred from relief due to their own negligence in agreeing to the Stipulated Judgment, when they had facts at hand which could have brought the very issues now presented to the attention of the Florida Court, citing *Indian Head,* 689 F.2d at 250, and other cases. *Indian Head.* however, was dealing with Rule 60(b)(1) and (6), and held that "Negligence of counsel is not among the equitable considerations which have been viewed as sufficiently compelling to warrant the exercise of 'independent and substantive equitable jurisdiction.' In fact, absence of fault or negligence of the defendants is one of the essential elements for an independent equitable action. (citing cases)." The rule was also followed in the Seventh Circuit in *Ben Sager Chemicals Intern., Inc. v. E. Targosz & Co.,* 560 F.2d 805, 809 (7th Cir.1977).

■ However, as to Rule 60(b)(5),[11] negligence or inadvertence is of no moment under the plain language of the rule. *See Central States, Southeast and Southwest Areas Pension Fund v. Central Cartage Co.,* 69 F.3d 1312, 1314 (7th Cir.1995) (due diligence is

applicable to (b)(2), but (b)(5) is open-ended, creating substantial discretion).

■ More important to the issue is the interpretation placed on the final phrase, allowing relief if it is no longer equitable that the judgment should have prospective application. The majority rule is that such provision applies to any judgment that has "prospective" effect (such as an injunction) as contrasted with a judgment that entails a present remedy (such as damages) for a past wrong. As explained in *Marshall v. Board of Ed., Bergenfield, N.J.,* 575 F.2d 417, 425 (3rd Cir.1978):

> Third, the "prospective application" clause of Rule 60(b)(5) affords the Board no relief. That clause incorporates the time-honored rule that a "court of equity (may) modify an injunction in adaptation to changed conditions." *United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932); *accord, Lubben v. Selective Service System Local Board No. 27, supra,* 453 F.2d at 651; 7 Moore's Federal Practice, supra ¶ 60.26(4), at 327–28; 11 C. Wright & A. Miller, supra § 2863, at 204–05; *see System Federation No. 91 v. Wright,* 364 U.S. 642, 646–48, 81 S.Ct. 368, 370–72, 5 L.Ed.2d 349 (1961); *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 431–32, 15 L.Ed. 435 (1856); *Jordan v. School District of City of Erie,* 548 F.2d 117, 120–22 (3d Cir.1977). The definitional limitation in subsection (5) is significant in that it empowers a court to modify a judgment only if it is "prospective," or executory, *see Pennsylvania v. Wheeling & Belmont Bridge Co., supra,* 59 U.S. (18 How.) at 431–32 (under common law). By contrast, a judgment at law for damages for past wrongs is "inherently final," *American Iron & Steel Institute v. EPA,* 560 F.2d 589, 599 (3d Cir.1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978), and remains unaffected by a subsequent change in the law. *Pennsylvania v. Wheeling & Belmont Bridge Co., supra,* 59 U.S. (18 How.) at 431.

---

11. Rule 60(b)(5) provides relief from final judgment on grounds "it is no longer equitable that the judgment should have prospective application."

The Ninth Circuit has adhered to such interpretation in *Maraziti v. Thorpe*, 52 F.3d 252, 254 (9th Cir.1995), citing *U.S. v. Swift*, supra, *Pennsylvania v. Wheeling & Belmont Bridge Co.*, supra and *Gibbs v. Maxwell House, A Div. of General Foods Corp.*, 738 F.2d 1153, 1155–1156 (11th Cir.1984) ("That plaintiff remains bound by the dismissal is not a 'prospective effect' within the meaning of rule 60(b)(5) any more than if plaintiff were continuing to feel the effects of a money judgment against him."). Thus, Debtor's reliance on 60(b)(5) to attack the money judgment is misplaced. With the above dissertation in mind, we proceed to consider each issue solely under Rule 60(b)(2), to determine if Debtors are entitled to relief on the merits based on mutual mistake in agreeing to the final judgment.

1. Income Tax Deduction

The parties dispute whether Weaver should be allowed to deduct federal income taxes in determining BKC's damages. BKC cites as support for its position that taxes should not be deductible *L.P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co.*, 277 U.S. 97, 100, 48 S.Ct. 449, 449, 72 L.Ed. 800 (1928) in which the Supreme Court wrote: "Even if the only relief that the Wrigley Co. [the infringer] can get is a deduction from gross income when the amount of its liability is finally determined, the Larson Company will have to pay a tax on the Wrigley profits when it receives them, and in a case of what has been found to have been one of conscious and deliberated wrongdoing, we think it just that the further deduction should not be allowed."

The Debtor cites *W.E. Bassett Company v. Revlon, Inc. (Bassett)*, 435 F.2d 656, 665 (2nd Cir.1970), and *Aladdin Mfg. Co. v. Mantle Lamp Co. of America (Aladdin)*, 116 F.2d 708, 714 (7th Cir.1941) in support of his contention that federal income taxes should be deductible in determining BKC's damages. This Court does not consider either *Bassett* or *Aladdin* to be persuasive authority. Neither case reconciles its holding allowing the deduction of federal taxes with *L.P. Larson, Jr., Co. v. Wm. Wrigley, Jr. Co.* In fact, neither case cites any case authority at all to support the deduction of federal income

taxes. Finally, both the Second Circuit and Seventh Circuit have held that income taxes are included in deductible overhead only where the infringer was nonwillful, which is not the circumstance in the instant case according to the District Court's findings in the Florida case.

The Second Circuit refused to follow its holding in *Bassett* in *In Design v. K–Mart Apparel Corp.*, 13 F.3d 559, 566–567 (2nd Cir.1994), writing instead:

It is settled law that the income tax paid on profits is not deductible where infringement was conscious and deliberate. *See L.P. Larson, Jr. Co. v. Wm. Wrigley, Jr., Co.*, 277 U.S. 97, 48 S.Ct. 449, 72 L.Ed. 800 (1928); *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 106 (2d Cir.1951); *Sheldon v. Metro–Goldwyn Pictures Corp.*, [106 F.2d 45, 53 (2d Cir.1939)]. In *Larson*, a case of a willful infringer, the Supreme Court held that the defendant could not deduct federal income and excess profits taxes from its gross income in determining the net profit for which it was liable. 277 U.S. 97, 99–100, 48 S.Ct. 449, [449] 72 L.Ed. 800. But the Court carefully limited the breadth of its holding where the circumstances of the infringer's conduct dictated that such a tax deduction would be proper. *See id.*

In *Stromberg Motor Devices Co. v. Detroit Trust Co.*, 44 F.2d 958, 965 (7th Cir.1930), a patent infringement case, the Seventh Circuit interpreted *Larson*'s caveat to stand for the proposition that in the case of a nonwillful infringer, such an income tax deduction would be appropriate. In *Stromberg Motor Devices Co. v. Zenith–Detroit Corp.*, 73 F.2d 62, 65 (2d Cir.1934), *cert. dismissed*, 294 U.S. 735, 55 S.Ct. 509, 79 L.Ed. 1263 (1935), citing both *Larson* and *Stromberg Motor Devices Co. v. Detroit Trust Co.*, we ruled that in the case of a nonwillful patent infringer an income tax deduction would be appropriate.

\* \* \*

In appropriate cases therefore we include income tax expenses in the deductible overhead in determining a defendant's net profit. *See, e.g., Murphy Door Bed Co. v.*

*Interior Sleep Sys., Inc.*, 874 F.2d 95, 103 (2d Cir.1989). Because the district court found K–Mart to be a nonwillful infringer, it should have allowed K–Mart a deduction for the taxes it paid on its innocently-acquired unlawful profits.

The Ninth Circuit has long followed the holding of *L.P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co.*, that in the absence of mitigating circumstances, income taxes are not proper deductions. *Wolfe v. National Lead Company*, 272 F.2d 867, 873 (9th Cir.1959); *Clamp Mfg. Co., Inc. v. Enco Mfg. Co., Inc.*, 1987 WL 46520 (C.D.Cal.1987).

■ In the Florida case the district court found that Weaver's infringement was deliberate and willful. In such circumstances income taxes are not proper deductions. *Wolfe v. National Lead Company*, 272 F.2d at 873; *L.P. Larson, Jr., Co. v. Wm. Wrigley, Jr.*, 277 U.S. at 100, 48 S.Ct. at 449; *In Design v. K–Mart Apparel Corp.*, 13 F.3d at 566–567; *Stromberg Motor Devices Co. v. Detroit Trust Co.*, 44 F.2d at 965. The Debtors infringed on BKC's trademark since 1991, profiting all the while. As the Second Circuit wrote: " '[o]pen and unabashed piracy is not a mark of good faith, and . . . 'in [those] circumstances' it [is] not proper to deduct taxes.'" *In Design v. K–Mart Apparel Corp.*, 13 F.3d at 566–567 (*quoting Alfred Bell*, 191 F.2d at 106). The Debtors will not be allowed deductions for income taxes paid for their willful and deliberate infringements.

## 2. Rent

That there was a mutual mistake on the rent issue is clearly evidenced by the record. Not only did Weaver not know of LaVoie's add back of the 8.5% rent deduction as to the IRS returns for 1991–1995, but Gettis's adoption of the "mistake" for 1996 shows both parties were mutually mistaken by the treatment of the deduction.

Having so concluded, the issue comes down to whether the 8.5% rent deduction would be a permissible reduction under the Lanham Act, apart from being prohibited under the Internal Revenue Code. I hold as a matter of law that the rent deduction is not permitted under these circumstances where the Debtor is a sole proprietorship. As explained by LaVoie, the payment of the 8.5% rent was nothing more than a draw on the account of the owner from the profits of the restaurant. In *Wolfe v. National Lead Company, supra*, 272 F.2d at 873, the Ninth Circuit held:

"Third, compensation to Wolfe and his partners for services rendered to the business. This is not a proper deduction under the facts of this case. *Callaghan v. Myers*, 1888, 128 U.S. 617, 9 S.Ct. 177, 32 L.Ed. 547; *Duro Co. (of Ohio) v. Duro Co. (of New Jersey)*, 3 Cir., 1932, 56 F.2d 313, 315; *Champion Spark Plug Co. v. Sanders*, D.C.E.D.N.Y.1952, 108 F.Supp. 674, 678, *affirmed*, 2 Cir., 1953, 204 F.2d 125."

■ We adhere to the doctrine that the plaintiff (BKC) in the Lanham Act case had the duty to prove the amount of the infringer's sales, and then the Defendants/Debtors have the burden to prove the expenses. *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1487–1488 (11th Cir.1987). We explained above that the citation relied upon by the Debtors, *Aladdin Mfg. Co. v. Mantle Lamp Co. of America, supra*, to support the rent deduction cannot be reconciled with *Larson Co. v. Wrigley Co.*, which holds at 277 U.S. at 100, 48 S.Ct. at 449:

"It would be unjust to charge an infringer with the gross amount of his sales without allowing him for the materials and labor that were necessary to produce the things sold, but it does not follow that he should be allowed what he paid for the chance to do what he knew he had no right to do."

I therefore conclude that it would be inequitable for the infringer to be awarded the fruits of his labor in the form of rent where his conduct was willful and deliberate, as found by the Florida District Court.

## 3. 80% Ownership

Clearly, a mutual mistake was made on this issue. Despite having the income tax returns spell out in clear fashion that restaurant # 1666 was owned 80% by Weaver, Gettis completely ignored the tax returns and therefore the solemn fact that Weaver through MWM, Inc., only was entitled to 80% of the profits of the store.

■ MWM, Inc., is a Montana corporation created under the Montana Small Business Act to be treated as a subchapter "S" corporation. Mont.Code Ann. §§ 15–30–

111(c), 201 and 202. The legal result of creating a subchapter "S" corporation is to treat it for tax and ownership purposes as though it were a partnership, so that the net profits (with some exceptions not applicable here) flow through the corporation, free of tax at the corporate level, to each stockholder in proportion to their ownership interest. 33A Am.Jur.2d *Federal Taxation* ¶¶ 4620, 4621 and 4660.[12] Thus, the 20% minority shareholder Blazicevich was entitled to 20% of the profits for all years from 1991–1996, and tax records provided by LaVoie to Gettis show that Blazicevich was indeed charged with 20% of the profits for each of the tax years. Gettis Ex. "O". By way of example, the U.S. income tax return for a "S" corporation for the year 1994 filed by MWM, Inc., shows ordinary income of $111,749, and was distributed in the Schedule K–1 to Weaver (80%—$89,399) and Blazicevich (20%—$22,-350).

As noted, BKC's argument is that the judgment is joint and several against MWM, Inc., as well as Weaver, citing *Brittingham v. Jenkins,* 914 F.2d 447, 458 (4th Cir.1990). The Debtor responds that *Brittingham* does not hold the debtor has to disgorge profits in excess of those he received. BKC's reliance on *Brittingham* is misplaced, for in that case the infringer was the sole owner of the corporation, and both were held jointly and severally liable. That case is not apropos to the facts here. It is undisputed, and I so hold, that Weaver and MWM, Inc., were only entitled to 80% of the profits from store # 1666. The remaining 20% were clearly allocated to the other owner, who was not a party-defendant in the infringement action. I hold it would be inequitable to assess the 20% owner responsible for the damages when that owner was never joined as an infringer in the Florida action. Under these facts, Weaver and MWM, Inc., are entitled to relief in the sum

of $221,108.90. In sum, the defendant-infringers are only to disgorge the 80% amount of profit which they wrongfully acquired. Nothing more, nothing less. To hold otherwise would be inequitable and beyond the scope intended under § 1117(a), which requires "subject to the principles of equity, (1) to recover *defendant's* profits ...." Accordingly, BKC's claim must be reduced by the sum of $221,108.90.

IT IS ORDERED the Debtors' objection to the Proof of Claim of Burger King Corporation is denied in part and sustained in part and Judgment shall be entered in favor of the Debtors in adversary proceeding 97/00104 disallowing the Proof of Claim of the defendant Burger King Corporation in the sum of $221,108.90, and allowing the Proof of Claim in the amount of $3,059,-680.94.

---

**12.** 33A Am.Jur.2d *Federal Taxation* ¶ 4620 states: "The taxable income of an S corporation is generally computed in the same manner as the taxable income of an individual ...." And ¶ 4621 states: "An S corporation is exempt from income taxes and its income is taxed directly to its shareholders ...."

Accordingly, all profits are passed through to the individual owner according to the percentage of their ownership interests. As stated in 33A Am.Jur 2d *Federal Taxation* ¶ 4660: "Almost all of an S Corporation's items of income, loss,

deduction and credit are passed through to, and taken into account by, the corporation's shareholders in computing their own income tax."

Montana's Small Business Corporation Taxation Code is the same. Mont.Code Ann.. § 15–30–111(c) and §§ 15–31–201 to –202 (Small Business Corporation means a subchapter "S" corporation of Chapter 1 of the Internal Revenue Code and is not subject to Montana Corporation license tax, but net income and loss is included in stockholders' adjusted gross income).